IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

| | | |
|---|---|---|
| RONNIE JACKSON, | § | |
| Institutional ID No. 02411339 | § | |
| SID No. 06601349 | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 1:23-CV-00093-BU[1] |
| v. | § | |
| | § | |
| CHIMDI AKWITTI, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS
OF THE UNITED STATES MAGISTRATE JUDGE**

Plaintiff Ronnie Jackson, an inmate incarcerated by the Texas Department of Criminal Justice (TDCJ), brings this action under 42 U.S.C. § 1983 against Warden Chimdi Akwitti and Assistant Warden Phillip McCain. Dkt. No. 22. Defendants now bring a Motion for Summary Judgment asserting qualified immunity. Dkt. No. 33.

For the reasons below, the undersigned RECOMMENDS that the Court GRANT Defendants' Motion. Jackson also filed a document docketed as a motion for summary judgment, Dkt. No. 37, but it is a single page restatement of his claims. Thus, the undersigned further recommends that Jackson's motion be DENIED.

## I.    JURISDICTION

Jackson brings this action under 42 U.S.C. § 1983, providing the Court with subject-

---

[1] This case was stayed and administratively closed, then reopened and the stay lifted on November 22, 2024. Dkt. No. 27.

matter jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3). Venue is proper in the Northern District of Texas, Abilene Division, because the events giving rise to Jackson's claims occurred at TDCJ's John Middleton Unit in Jones County, Texas. *See* Dkt. No. 1. The undersigned has the authority to enter these Findings, Conclusions, and Recommendations after United States District Court Judge James Wesley Hendrix transferred this case to the undersigned for preliminary screening. Dkt. No. 7; 28 U.S.C. § 636(b)(1)(B).

## II.    FACTUAL BACKGROUND

As alleged, Jackson and "200 or so" other inmates were required to sleep on the floor of the gym while at the Middleton Unit for several weeks, some up to two months. Dkt. No. 1 at 5. Jackson is one of at least eleven "gym floor" plaintiffs who allege similar facts. Dkt. No. 22 at 2. Through the Court's review of the gym-floor cases, the Court learned that inmates were likely assigned to the gym according to an overarching policy of placing inmates with heat restrictions in air-conditioned housing. *Id*. at 3 fn 4. Each plaintiff, including Jackson, appears to have had a heat restriction based on a medical condition, a mental health condition, or a prescribed medication, and the gym at the Middleton Unit had air conditioning.[2] *Id*. Upon his intake at the Middleton Unit, Jackson's multiple medical restrictions included lower bunk only, no repetitive squatting, no walking on wet or uneven surfaces, and no temperature extremes. Dkt. No. 36 at 61.

Jackson and the other gym-floor plaintiffs do not complain simply about sleeping on the floor. This condition was exacerbated by several others. For instance, Jackson

---

[2] It is not clear from the record whether other parts of the Middleton Unit also had air conditioning at the time.

alleges the rat infestation was so bad that he witnessed inmates pulling dead rats out of gym drains to unclog them. Dkt. Nos. 1 at 5, 11 at 3. Additionally, for bedding on the floor Jackson was provided a "mattress that was busted and torn with the padding material falling out and that highly smelled of urine." Dkt. No. 11 at 4 (cleaned up). Jackson says the "toilets and urinals kept overflowing and drains did not properly drain due to clogging" and then he would have to walk through that back to where he slept on the floor. *Id*. at 5. These conditions did not improve before Jackson, after spending a combined 31 days in the gym, was transferred out of the Middleton Unit. *Id*.

Further exacerbating Jackson's circumstances, he suffered from pre-existing medical conditions, which were documented upon his intake at the Middleton Unit. His intake forms, which are in the summary judgment evidence, reflect heart disease and a "recent" heart attack that required stents. Dkt. No. 36 at 67. They also reflect a swollen prostate. *Id*. at 63. The intake records indicate that Jackson "was using a walker and wheelchair in county." *Id*. at 57. They also note, "left hip tenderness, unable to squat, unsteady gait." *Id*. at 59. Based on his intake exam, medical staff restricted Jackson to a lower bunk only, no repetitive squatting, no walking on wet or uneven surfaces, and no temperature extremes. *Id*. at 61. Three days after Jackson was assigned to the gym, September 29, 2022, medical staff noted his chief complaint as "left hip chronic pain from dislocation/nerve damage in 2021." *Id*. at 57 (cleaned up). However, apparently after a hip x-ray that same day, which did not reveal any serious concerns, Jackson returned to the gym for two more days. *Id*. at 48.

After five total days of sleeping on the gym floor, medical staff provided Jackson a

3

wheelchair and recorded, "offender placed in administrated segregation as the gym does not have any beds to accommodate offender healthcare disability." *Id*. at 5. Four days later, while in restrictive housing (RH), Jackson submitted a sick-call request stating:

> I been having a numbing pain the past few days from my prostate. I found what looks like blood possibly in my underwear. I just noticed after I took a shower. I just want to let you know I been feeling this pain for about 2-3 days.

*Id*. at 35.

Regarding the duration of Jackson's assignment to the gym, Defendants and Jackson disagree. According to Jackson, he entered the gym on September 26, 2022. Dkt. No. 11 at 5. He was then moved to RH in October 2022. *Id*. After one month in RH he was then "released back into [the] gym" where he remained until his December 7 transfer to the Lindsey Unit. *Id*.

According to Defendants, Jackson was "housed on the gym floor for a brief period of time." Dkt. No. 34 at 6. They say that "Jackson was housed in the gym for approximately five days before being placed in restrictive housing and then later transferred to the Lindsey Unit." *Id*. Therefore, Jackson and Defendants agree that he was assigned to the gym initially for five days, but disagree as to whether he was later returned to the gym. Defendants point to medical records to arrive at their conclusion. *Id*.

Jackson brings this §1983 claim against Defendants in their individual capacities seeking money damages. Dkt. No. 22 at 12 (dismissing claims against TDCJ and claims against Defendants in their official capacities). Jackson seeks $3.3 million in compensatory and punitive damages "concerning [his] mobility (walker) and current cardiovascular issues." Dkt. No. 1 at 4

## III.    LEGAL STANDARDS

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists if a reasonable jury could enter a verdict for the non-moving party." *Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d 351, 358 (5th Cir. 2020). Typically, the moving party "bears the initial responsibility of . . . demonstrat[ing] the absence of a genuine issue of material fact." *Jones v. United States*, 936 F.3d 318, 321 (5th Cir. 2019) (cleaned up). The moving party may "identify those portions of [the record] which it believes demonstrate [that] absence." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When a summary judgment movant asserts a qualified immunity defense, that assertion "alters the usual summary judgment burden of proof." *Brown v. Callahan,* 623 F.3d 249, 253 (5th Cir. 2010). "Qualified immunity shields government officials from liability when they are acting within their discretionary authority and their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known." *Gates v. Texas Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 418 (5th Cir. 2008) (citations omitted). The doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Movants have no burden "to put forth evidence to meet [their] summary judgment burden for a claim of immunity" and need only assert the defense in good faith. *Beck v. Tex. State Bd. of Dental Examiners*, 204 F.3d 629, 633 (5th Cir. 2000). "[O]nce properly

5

raised by the defendant, the plaintiff has the burden to negate the assertion of qualified immunity." *King v. Handorf*, 821 F.3d 650, 653 (5th Cir. 2016) (citation and internal quotation marks omitted). This means the plaintiff "must show: (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).

In deciding whether a plaintiff has shown a violation of a protected right, courts consider the facts alleged in the light most favorable to the plaintiff. *Saucier v. Katz*, 533 U.S. 194, 200 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223 (2009). But "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, 'or only a scintilla of evidence.'" *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam)). The plaintiff must identify specific evidence in the record and show how it presents a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 324; *see also RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010). Furthermore, "[t]he court has no duty to search the record for material fact issues." *RSR Corp.*, 612 F.3d at 857; *see also Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012) ("If somewhere in a record there is evidence that might show a dispute of material fact, the district court needs to be pointed to that evidence as opposed to having to engage in an extensive search.").

## IV.    ANALYSIS

To overcome Defendants' assertion of qualified immunity on summary judgment,

6

Jackson must show the existence of a fact issue on each of the following: (1) objectively, Defendants exposed him to a substantial risk of serious harm by denying him the minimal measure of life's necessities; (2) subjectively, Defendants were deliberately indifferent to the risk; (3) Jackson suffered a compensable injury; (4) the law was clearly established that Jackson had a constitutional right to be free from the alleged conditions; and (5) in light of clearly established law Defendants conduct was objectively unreasonable.

The first through third elements relate to the first prong analysis—a constitutional violation. The fourth and fifth elements relate to the second prong analysis—clearly established law. The undersigned will address each element in turn.

Jackson did not produce any evidence in response to Defendants' Motion. However, the Court may consider Jackson's verified allegations as competent summary judgment evidence. *See Hart v. Hairston*, 343 F.3d 762, 765 (5th Cir. 2003). Furthermore, at this stage, the Court must "accept the plaintiff's version of the facts (to the extent reflected by proper summary judgment evidence) as true." *Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 655 (5th Cir. 2004).

### 1. The First Prong: Constitutional Violation

#### a. Eighth Amendment Conditions of Confinement

The Eighth Amendment prohibits "cruel and unusual punishments," U.S. Const. amend. VIII, and "[t]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Gates v. Cook*, 376 F.3d 323, 332 (5th Cir. 2004). While the Constitution does not mandate comfortable prisons, it does not permit inhumane ones. *Rhodes* v. *Chapman*, 452 U.S. 337, 349 (1981);

7

*Farmer v. Brennan*, 511 U.S. 825, 832 (1994). An Eighth Amendment violation occurs when prison conditions pose an unreasonable risk of serious damage to a prisoner's health—an objective test—and prison officials act with deliberate indifference to the risk posed—a subjective test. *Garrett v. Lumpkin*, 96 F.4th 896, 900 (5th Cir. 2024).

The objective component also requires showing that the conditions were objectively "sufficiently serious" or "extreme." *Farmer*, 511 U.S. at 834 (citation omitted) (first quote); *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (second quote). The deprivation must involve a basic human need—such as food, clothing, medical care, and safe and sanitary living conditions—and must deny the inmate of the minimal civilized measure of life's necessities. *Hope v. Harris*, 861 F. App'x 571, 582 (5th Cir. 2021); *Chapman*, 452 U.S. at 347–49. The conditions are measured against the standards of decency that mark the progress of a maturing society. *Chapman*, 452 U.S. at 346–48.

For the objective component, the Court must examine the totality of the circumstances. *Id*. at 363–64. Even if no single condition of confinement alone would be unconstitutional, exposure to multiple conditions may subject inmates to cruel and unusual punishment when they have a "mutually enforcing effect" that produces the deprivation of a single, identifiable human need, such as food, warmth, or exercise. *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (explaining that there may be an Eighth Amendment violation where a prisoner complained of a "low cell temperature at night combined with a failure to issue blankets").

The subjective component requires proof that the prison official acted with deliberate indifference to inmate health or safety. *Farmer*, 511 U.S. at 834 (to violate

the Cruel and Unusual Punishments Clause, a prison official must have a sufficiently culpable state of mind). The standard is not met merely from a negligent or even a grossly negligent response to a substantial risk of serious harm. *Dyer v. Houston*, 964 F.3d 374, 381 (5th Cir. 2020).

Therefore, the inmate must show that prison officials were: (1) "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists"; (2) "subjectively drew the inference that the risk existed"; and (3) "disregarded the risk." *Cleveland v. Bell*, 938 F.3d 672, 676 (5th Cir. 2019) (citing *Farmer*, 511 U.S. at 837) (alterations omitted). More simply, the prison officials must know of, and disregard, an excessive risk to a prisoner's health or safety. *See id.* (citation omitted). Under exceptional circumstances, a prison official's knowledge of a substantial risk of harm may be inferred by the obviousness of a substantial risk. *Bradley v. Puckett*, 157 F.3d 1022, 1025 (5th Cir. 1998).

b.  Objective Component

Jackson contends that he was forced to (1) sleep on the floor, (2) on a urine-stained mattress, (3) in a rat-infested gym, (4) with over-flowing toilets, and (5) that the gym was crowded with 200 inmates, all of which constitutes cruel and unusual punishment. Dkt. Nos. 1 at 5, 11 at 4–5. He adds that these conditions were exacerbated by his documented medical conditions and the length of time he was forced to endure the conditions. Dkt. No. 11 at 5, 7.

i.  *The gym conditions*

Defendants do not appear to contest that many, if not all, of the alleged conditions

existed. Rather, they argue that "[m]aintenance was done, several repairs were made to the urinals and toilets, steps were taken to control the temperature in the gym, and pest control measures were in place throughout Jackson's time at the Middleton Unit." Dkt. No. 34 at 6. The existence of the alleged conditions, at least for a time, then appears to be undisputed, but Defendants insist that they "are not in and of themselves objectively extreme." *Id.* at 8. The undersigned agrees with this assessment as far as it goes. There exists little, if any, caselaw to support that any of the alleged conditions, in isolation, was a constitutional violation.[3] *Id.* at 8–9.

But a court evaluating a conditions-of-confinement claim must consider the totality of the circumstances a prisoner was forced to endure. *Chapman*, 452 U.S. at 363–64. The objective circumstances here include not only the individual conditions themselves, but whether they acted in combination with each other, their duration, and the health of the inmate to have the mutually enforcing affect of creating a constitutional violation. Given the conditions themselves are mostly undisputed, the undersigned turns first to Jackson's preexisting medical conditions before turning to the duration of his exposure to harm.

---

[3] *Elliott v. Cerliano*, No. 6:20-CV-00446, 2022 WL 2496200 (E.D. Tex. July 6, 2022) (presence of pests, without more, does not amount to a constitutional violation); *Lett v. La Salle Sw. Corr.*, No. 3:21-cv-02257-S (BT), 2023 U.S. Dist. LEXIS 194118 (N.D. Tex. Sep. 7, 2023) ("only in extreme circumstances do unsanitary conditions rise to the level of a constitutional deprivation"); *Reagan v. Burns*, Civil Action No. 3:16-CV2590-G-BH, 2019 U.S. Dist. LEXIS 213305 (N.D. Tex. Oct. 30, 2019) (extreme cold and poor ventilation do not rise to a level of seriousness constituting a constitutional violation); *Johnson v. Tex. Bd. of Criminal Justice*, 281 F. App'x 319 (5th Cir. 2008) (vague allegations of exposure to either cold or heat is insufficient); *Sowell v. Kyle*, No. 2:08-CV-0051, 2011 U.S. Dist. LEXIS 10384 (N.D. Tex. Jan. 13, 2011) (the court found that water being turned off in a cell due to a toilet overflowing, and the toilet containing items in it, causing the plaintiff to have to sleep near it for a limited amount of time, was not a constitutional violation); *Smith v. Copeland*, 87 F.3d 265, 268 (8th Cir.1996) (the Eighth Circuit found that an inmate's four day confinement in a cell with an overflowing toilet, creating a stench of feces and urine, did not violate the Eighth Amendment).

### ii.    *Jackson's medical conditions*

Defendants acknowledge that Jackson and others were assigned to the gym due to their medical needs or compromised medical conditions. Dkt. No. 34 at 6. But Defendants do not elaborate on the process or criteria used in making these assignments, the reason floor assignments in the gym were necessary in the first place, or how long the wardens expected floor assignments to last once they were implemented. These questions cannot be answered on this record.

Defendants do not dispute that Jackson had the medical conditions he claims—nor could they on this record. Their argument instead, at first, is that there was no *record* of Jackson having a heart condition or hip pain until his intake exam on September 29, 2022:

> [B]ased on Jackson's medical records, there was no record of his heart condition or injury to his hip until September 29, 2022, when he was getting a physical exam. There was no medical records of Jackson having an issue with his prostate until October 27, 2022, when he alleges that he was "having blood and some pain with urination since 9/2022."

Dkt. No. 34 at 9. This appears mostly true. As explained, Jackson's September 29 intake exam documented his heart disease, a "recent" heart attack that required stents, and chronic hip pain. Dkt. No. 36 at 63, 67. But it also documented his "swollen prostate." *Id*. at 63. The intake exam further noted that Jackson's chief complaint at the time was "left hip chronic pain from dislocation/nerve damage in 2021," that Jackson "was using a walker and wheelchair in county," and that he was experiencing "left hip tenderness, [inability] to squat, [and] unsteady gait." *Id*. at 57, 59. His employment history was recorded at intake as "Disable[d]." *Id*. at 57. Lastly, medical staff noted that Jackson had "Adjustment

Disorders, with Mixed Anxiety and Depressed Mood First Observed 10/14/2022[.]"[4] *Id*. at 71.

Presumably based on these intake findings, medical staff assigned Jackson several medical restrictions, including those for a lower bunk only, no repetitive squatting, no walking on wet or uneven surfaces, and no temperature extremes. *Id*. at 61. Staff also assigned Jackson a "walker/rollator" for the next 365 days. *Id*. at 60. So, while true there was no record of Jackson's heart condition or hip problems prior to intake, there was *as of the intake* exam on September 29, at which time Jackson was assigned to the gym floor. Indeed, it appears Jackson was assigned to sleep on the gym floor despite even his lower bunk restriction, the supposed purpose of which is to make getting in an out of bed easier. In that respect, the floor is no better than an upper bunk. But notwithstanding these restrictions, Jackson's housing assignment remained, "Gym 131," and, after his intake exam, he was sent back to the gym floor for at least two more days. *Id*. at 66.

After five days in the gym, Jackson was reassigned to RH because "the gym does not have any beds to accommodate offender healthcare disability." *Id*. at 5. As discussed further below, Jackson alleges that after a time in RH, he was returned to the gym floor for what ended up being a total of 31 days, while Defendants assert he was there only these first five days.

All to say, the *existence* of Jackson's medical conditions—some of which

---

[4] Despite the "First Observed" date, medical staff noted in his September 29 intake exam that Jackson had psychiatric conditions and was prescribed two anti-depressant/anti-anxiety medications. *See* Dkt. No. 36 at 42, 63, 66.

reasonably would have counseled against a floor assignment—does not appear to be disputed and are part of the totality of circumstances the Court, and a reasonable jury, should consider in assessing whether Jackson was objectively exposed to a substantial risk of serious harm.

### iii. Duration of Jackson's exposure to conditions

The parties disagree on how long Jackson was assigned to the gym. Jackson claims he entered the gym on September 26. Dkt. No. 11 at 5. He was then moved to RH in early October. *Id*. Jackson says he "stayed [in RH] a month and was released back into [the] gym." *Id*. All told, Jackson's allegations, viewed in his favor, suggest he was in the gym for approximately 31 days.

Defendants counter that Jackson's medical records show he was "only in the gym for roughly five days" and that there was "no record of Jackson being placed back in the gym after he was placed in restrictive housing." Dkt. No. 34 at 9–10. Defendants are correct that there are no records in evidence that reflect Jackson being returned to the gym. But Defendants do not point to any records that show where Jackson was housed during the time he claims to have been returned to the gym. In other words, the records do not directly rebut Jackson's allegations on this point.[5]

---

[5] Medical records tend to show the following: Jackson was housed in the gym starting on September 26, 2022. Dkt. No. 36 at 66 (Checked box on intake form to release Jackson to general population). He was moved to RH on October 1, 2022. *Id*. at 5. There was talk on November 10, 2022, of whether Jackson needed to remain in "seg. Housing." *Id*. at 17. The next day he was evaluated to see whether he still required a wheelchair and whether he could be placed back in general population. *Id*. at 15. The result of that visit was to replace Jackson's wheelchair with a walker and an instruction that "[h]e may be sent back to GP." *Id*. On December 7, 2022, he received a transfer screening at the Lindsey Unit signaling his transfer from the Middleton Unit to the Lindsey Unit. *Id*. at 70. Therefore, viewed in the light most favorable to Jackson, it is possible that he spent five days on the gym floor (September 26, 2022–October 1, 2022) and then

The absence of a specific record entry documenting that Jackson was later returned to the gym may get Defendants around the hearsay rule as an absence of a record of a regularly conducted activity. *See* Federal Rule of Evidence 803(7). But that merely allows the Court to consider the absence of record entries as competent summary judgment evidence, just like Jackson's verified allegations. In other words, the *absence* of records on how long Jackson was in the gym does no more here than help create, vis-à-vis Jackson's verified allegations, a factual dispute regarding how long Jackson was there. Such evidence does not conclusively establish how long Jackson was assigned to the gym, nor does it remove the duration of that assignment from the realm of disputed fact. To the extent Jackson's Custody Housing Assignment History would resolve this dispute—and it likely would have—those documents were not included in Defendant's summary judgment evidence.

On this record, a reasonable jury could conclude that Jackson was assigned to the gym as long as he claims. That same reasonable jury could then rely on that duration as an aggravating factor in the totality of Jackson's circumstances, thus increasing the severity of his deprivation. *Harris*, 861 F. App'x at 586 (Haynes J., concurring in part). Extremely egregious conditions, even for a short duration, can give rise to an Eighth Amendment claim. *See Taylor v. Riojas*, 592 U.S. 7, 52–54 (2020) (filthy cell with massive amounts of feces, 4 days; then frigid cell with clogged drain and no clothes, 2 days). The calculus

---

returned to the gym floor until his transfer to Lindsey (November 11, 2022–December 7, 2022). This amounts to a total of 31 days on the floor. This timeframe is supported by the medical records when viewed together with Jackson's allegation that he spent only one month in administrative segregation.

obviously runs in the other direction, as well—less egregious conditions can become a constitutional violation if a prisoner is forced to endure them for a long time. *See Hutto v. Finney*, 437 U.S. 678, 686–87 (1978) (holding that "the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards" and observing that "[a] filthy, overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months").

Ultimately, a reasonable jury could find that Jackson spent five days in the gym, 31 days in the gym, or somewhere in between. But that question cannot be answered on this record.

### iv.    *Mutually enforcing effect of conditions*

The summary judgment evidence also fails to resolve genuine factual disputes about whether the combined conditions—rats, urine-smelling mattress, no bunk or cot, overcrowding, backed up plumbing—had a mutually enforcing effect of objectively depriving Jackson of the basic human need of safe and sanitary living conditions. As discussed, the Court must further consider these combined conditions in the context of (a) Jackson's medical conditions when assigned to the gym and (b) the duration of Jackson's exposure to the gym conditions. *Harris*, 861 F. App'x at 582. Jackson's verified pleadings provide more than a scintilla of evidence from which a reasonable jury could resolve these issues in his favor, and Defendants have failed to sufficiently rebut these claims to remove them from the province of a jury.

### v.    *Genuine disputes of material fact exist on whether the totality of conditions Jackson was exposed to constituted an unreasonable risk of serious harm*

Based on Jackson's verified allegations and the records before the Court, both viewed in a light most favorable to Jackson, a reasonable jury could find that Jackson was exposed to a combination of conditions in the gym that had the mutually enforcing effect of depriving Jackson of the basic human need of safe and sanitary living conditions. This issue is both material and incapable of being resolved on the summary judgment evidence before the Court.[6]

### c.  Subjective indifference

Having determined that fact issues exist as to whether Jackson was objectively exposed to a substantial risk of serious harm, the undersigned turns now to whether Jackson can show genuine disputes on whether each warden acted with deliberate indifference to that risk.[7] *See Farmer*, 511 U.S. at 834. The undersigned begins with Akwitti.

### i.  *Warden Akwitti's subjective indifference*

Jackson asserts that Akwitti was directly aware of the conditions in the gym. According to Jackson, "Warden Akwitti had told Jackson and the other inmates on three occasions that they had fixed the problems weeks before the inmates['s] arrival." Dkt. No.

---

[6] The duration Jackson endured these conditions is particularly concerning. As the *Hutto* court observed, the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards. 437 U.S. at 686–87. Here, being exposed to the alleged combined conditions for 31 days aggravates the severity of the overall deprivation. *Harris*, 861 F. App'x at 586 (Haynes J., concurring in part). Ultimately, the combined conditions "might have been tolerable for a few days" but became "intolerably cruel" when endured for 31 total days. *See Hutto*, 437 U.S. at 686–87. It must be remembered that the sole reason Jackson and the other inmates were in the gym was because TDCJ recognized they were medically unable to endure the heat.

[7] The court must address the actions of each warden individually to determine whether qualified immunity applies. *Cass*, 844 F.3d at 730-31; *Meadours v. Ermel*, 483 F.3d 417, 421-22 (5th Cir. 2007); *Stewart v. Murphy*, 174 F.3d 530, 537 (5th Cir. 1999).

11 at 3 (cleaned up). Combined with Jackson's allegation that the conditions never improved, the verified pleadings could reasonably support a finding that Akwitti personally visited the gym multiple times and was fully aware of whatever conditions existed. On this, there is no genuine dispute. Common sense also dictates that, even on Defendants' version of the facts, the warden would have not only known of the conditions, but also would have made or approved the decision to house inmates in the gym and established the criteria for such assignments.

It is also undisputed that Akwitti understood the medical vulnerability of the inmates assigned to the gym. Defendants admit that "[b]ecause of Jackson's medical conditions and heat restriction, Jackson, along with several other inmates, were housed on the gym floor for a brief period of time." Dkt. No. 34 at 6. In other words, inmates were assigned to the gym precisely because they had medical or mental health conditions and were being treated for the same. It is reasonable to infer that Akwitti further knew that those housed there, including Jackson, faced heightened medical risks if confined under other adverse conditions, including those that were unsanitary, overcrowded, unsafe, or otherwise unhealthy.

Jackson's allegations regarding the duration of the conditions, if proven, would reasonably strengthen the inference of deliberate indifference. If the duration of Jackson's gym assignment is resolved at trial in Jackson's favor, then a reasonable jury could also conclude that Akwitti had ample opportunity during those 31 days to observe and correct the conditions. In other words, this was not a situation requiring split-second decision-making or an emergency response where qualified immunity typically affords officers the

benefit of the doubt. *See Villarreal v. City of Laredo*, 134 F.4th 273, 284 (5th Cir. 2025) (Oldham, J., concurring). The longer Jackson was in the gym, the more likely it was that Akwitti was both aware of the conditions and had time to effectively abate them, including by relocating the inmates, providing cots, stepping up maintenance and pest control, or other measures, but instead disregarded the risk. *Harris*, 861 F. App'x at 586 (Haynes J., concurring in part).

Defendants advance one principal argument here: Akwitti could not have been deliberately indifferent because the record shows he took reasonable measures to repair amenities and to abate the presence of pests. Dkt. No. 34 at 10. But those measures must be reasonable. *Farmer*, 511 U.S. at 847 ("[A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take *reasonable* measures to abate it.") (emphasis added). A reasonable jury could conclude that even repeated attempts to resolve a condition when officials know the attempts are inadequate are overall unreasonable.

Further to this point, Defendants fail to provide context from which the Court can determine whether these remedial actions were reasonable. Akwitti claims that between March 3, 2022, and November 8, 2022, maintenance addressed gym plumbing issues 18 times and that between September 2022 and December 2022 pest control was brought in five times. Dkt. No. 34 at 11. But the reasonableness of making 18 plumbing repairs in eight months can only be assessed after knowing how many plumbing repairs were in fact needed during that same time. The record is silent on that fact. If the toilets, urinals, and

18

sinks were in a constant state of disrepair despite intermittent fixes—not an unreasonable inference in a confined space with 200 inmates—that might reflect on the reasonableness of 18 repairs over eight months. Same with pest control. If there was an intractable rat infestation in a gym where 200 inmates were forced to sleep on the floor—which also has support in the summary judgment evidence—then are five pest control treatments reasonable?[8]

Given the variables involved, the answers to these questions are difficult to resolve on this record. This is partly because the alleged conditions are by their nature fact intensive. But it is also because the maintenance and pest control records in the summary judgment evidence are of little help. For instance, the undersigned can only find 16 instances of gym plumbing repairs between March and November 2022, and four of those were made to the officers' restroom in the gym. *See* Dkt. No. 36 at 86–117. Of the remaining 12 repairs to the inmate portion of the gym, only three of those were made during the time Jackson might have been assigned to the gym. And all three were made on the same day, November 9, 2022. *Id*. at 112. While it is possible that three plumbing repairs on a single day were a reasonable response to the gym's plumbing problems during the two-and-a-half months Jackson was at the Middleton Unit, the summary judgment record

---

[8] Several entries in the records tend to corroborate Jackson's assertions that the gym was "completely infested with rats", "[a]s well as other sanitation violations." Dkt. No. 5 at 7. For instance, one pest report notes that the "kitchen was very dirty, with lots of food everywhere, trash all over the place, water standing on the ground, and lots of rats seen taking food from the floor." Dkt. No. 36 at 123 (cleaned up). Another states, "Rodent droppings in food services, dry storage, commissary, and medical. Units all dirty. Housing areas need to clean around trash cans." *Id*. at 125 (cleaned up). Another states, "Water on ground in kitchen. Horrible smell. Removed a dead rat from kitchen." *Id*. at 122. Another states, "Kitchen needs cleaning. Water and food on ground. All housing areas needs to be cleaned." *Id*. at 121. And yet another states, "Dirty and wet. Food all over ground. Food swept into piles. Trash laying around." *Id*. at 126 (cleaned up).

does not help answer that question, and a reasonable jury might regard that response as unreasonable.

The records provided by Defendants on pest control are even less helpful. Defendants argue that "Pest Control Records show that on September 9, 2022, October 12, 2022, November 1, 2022, December 5, 2022, and December 7, 2022, pest control was brought in to apply pest control measures." Dkt. No. 34 at 11. Again, context is important. The record supports that pest control services visited the Middleton Unit five times from September through December. Dkt. No. 36 at 120–27. But the record only supports that the gym was treated on one of those occasions, on September 6. *Id.* at 123.

The summary judgment evidence establishes that Akwitti took some remedial measures over several months in response to the conditions in the gym, and elsewhere. The evidence further establishes that the measures that were taken were themselves reasonable. But the Fifth Circuit has held that taking some reasonable measures does not mean an officer, on the whole, behaved reasonably. *Converse v. City of Kemah*, 961 F.3d 771, 779 (5th Cir. 2020) (citing *Jacobs v. West Feliciana Sheriff's Dep't*, 228 F.3d 388, 395–96 (5th Cir. 2000)). A reasonable jury could find that despite Akwitti taking some reasonable steps, his overall response to the prolonged conditions in the gym was not, on the whole, reasonable. And that it may not have been, on the whole, reasonable to address only some of the conditions—rats and plumbing—while ignoring some of the more dangerous conditions that posed a substantial risk to Jackson's health and safety—sleeping on the floor and overcrowding.

Thus, based on the summary judgment evidence, a reasonable jury could find: (1)

20

Akwitti was aware that a large number of inmates, including Jackson, were assigned to the gym, and that Akwitti likely made that decision; (2) due to the inmates having either a medical or mental health condition or treatment; (3) Akwitti was aware of the adverse conditions in the gym; (4) Akwitti was aware the conditions persisted weeks if not months despite remedial measures being taken; and (5) that more remedial measures were within his control to make, but he did not make them. The summary judgment evidence is sufficient to create genuine disputes of material fact as to whether Akwitti acted with deliberate indifference.

### ii.    *Assistant Warden McCain's subjective indifference*

Turning now to Assistant Warden McCain, here again McCain argues that he "took reasonable measures to repair amenities and to abate the presence of pests," and thus he was not deliberately indifferent. Dkt. No. 34 at 10. Jackson's verified pleadings state that McCain told Jackson that "they had rats clogging the drainpipes" in the gym and that Jackson "personally saw inmates pulling dead rats out of drains." Dkt. No. 11 at 3 (cleaned up). Jackson further alleges, "Warden McCain knew all along before we were put in the gym that the conditions were bad months before." *Id.* at 2. Although this latter allegation may be dismissed as conclusory, the former suggests that McCain visited the gym on at least one occasion when he spoke to Jackson. If a reasonable jury finds the conditions existed as Jackson claims, which it could, the same jury could find that those conditions would have been readily apparent to McCain during his visits to the gym. The record of remedial measures is a two-edged sword. Yes, they are evidence of attempts to address the problems, but they are also necessarily evidence of awareness of the problems.

21

Moreover, viewing the facts in the light most favorable to Jackson, it is reasonable to infer that McCain was privy to the same baseline knowledge as Warden Akwitti: that medically vulnerable inmates were housed on the gym floor for an extended time under debased conditions which were not effectively addressed through, what appears to be, routine maintenance and pest control. *See* Dkt. No. 34 at 6 (Jackson and others were assigned to the gym floor because of "medical conditions and heat restriction[.]").

Thus, as with Akwitti, a reasonable jury could find: (1) McCain was aware that a large number of inmates, including Jackson, were assigned to the gym, and that McCain was likely involved in that decision as assistant warden; (2) due to the inmates having either a medical or mental health condition or treatment; (3) McCain was aware of the adverse conditions in the gym; (4) McCain was aware the conditions persisted weeks if not months despite remedial measures being taken; and (5) that more remedial measures were within his control to make, but he did not make them. The summary judgment evidence is sufficient to create genuine disputes of material fact as to whether McCain acted with deliberate indifference.

d.  Compensable injury

Having shown genuine disputes on the objective and subjective components of an Eighth Amendment conditions-of-confinement claim, Jackson must now show he suffered a compensable injury.

Jackson sues Defendants in their individual capacities and seeks $3.3 million in compensatory and punitive damages "concerning [his] mobility (walker) and current cardiovascular issues." Dkt. No. 1 at 4. Because Jackson seeks money damages rather than

injunctive relief, he must show that the conditions caused an actual injury. *Coleman v. Dallas Cnty. Jail*, No. 3:19-cv-3009-L-BN, 2020 WL 7029915, *4 (N.D. Tex. Oct. 22, 2020); *Harper v. Showers*, 174 F.3d 716 (5th Cir. 1999) (claims for declaratory and injunctive relief to end allegedly unconstitutional conditions of confinement are not barred by the PLRA's restriction on availability of damages for mental or emotional distress). If Jackson cannot demonstrate an actual injury, Defendants are entitled to qualified immunity despite a genuine issue of material fact as to all other elements.

Under the PLRA, "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury . . . ." 42 U.S.C. § 1997e(e). In a conditions-of-confinement claim, the injury must be more than *de minimis* but need not be significant. *Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir. 1997) (a sore, bruised ear lasting for three days was *de minimis*). This reflects the principle that the Constitution is not concerned with a "*de minimis* level of imposition." *See Ingraham v. Wright*, 430 U.S. 651, 674 (1977).

Many plaintiffs who seek monetary damages in conditions-of-confinement cases fail to show a compensable injury, as unpleasant conditions often cause only emotional distress or *de minimis* physical harm.[9] Some, however, succeed in showing more than *de*

---

[9] *Halthon v. Jackson Cty.*, No. 1:08cv47-HSO-JMR, 2009 U.S. Dist. LEXIS 124060, at *21 (S.D. Miss. Oct. 13, 2009) (no compensable injury from complaints of black mold, mildew, overcrowding, sleeping on mats on floors, or the lack of razors for hygiene) (plaintiff alleges that arthritis was aggravated due to cold temperatures in cell, but court noted that plaintiff never mentioned in his sick calls that the cold was aggravating his arthritis); *Alexander v. Tippah Cnty. Miss.*, 351 F.3d 626, 630–31 (5th Cir. 2003), *cert. denied*, 541 U.S. 1012 (2004) (nausea and vomiting caused by raw sewage on floor of jail cell was *de minimus*); *Harper v. Showers*, 174 F.3d 716 (5th Cir. 1999) (damage claim for emotional distress barred by

*minimis* physical injuries.[10] For instance, in *Taylor v. Stevens*, the plaintiff's bladder became distended from prolonged urine retention and required catheterization, 946 F.3d 211, 223–25 (5th Cir. 2019). Similarly, in *Hope v. Pelzer*, the court found that "a reasonable jury could infer from Plaintiff's deposition testimony that the alleged injuries were serious enough to exceed the *de minimis* threshold and warrant the award of damages." No. CV-96-BE-2968-S, 2005 U.S. Dist. LEXIS 47326, at *3 (N.D. Ala. Sept. 28, 2005). Other cases the Court reviewed for its analysis of the objective component of the first prong either sought only injunctive relief, predated § 1997e(e), or did not address the compensable-injury requirement.

Jackson alleges that having to get up and down from the floor where he slept caused: (1) strain and stinging in his chest due to his prior heart attack that required three stents; (2) his enlarged prostate to bleed slightly and blood to be found in his urine; and (3) loss of sleep due to pain. *Id*. at 6–7. Defendants counter that the "medical records show that there was no aggravation of Jackson's existing medical conditions." Dkt. No. 34 at 6. They argue:

> [T]here are no medical records of diagnoses or complaints documenting that

---

PLRA where plaintiff failed to allege any physical injury from sleep deprivation or unsanitary and filthy cells); *Herman v. Holiday*, 238 F.3d 660 (5th Cir. 2001) (damage claim by inmate for emotional and mental distress caused by fear that exposure to asbestos may result in asbestos-related disease barred by PLRA) (likewise, damage claim by inmate for emotional and mental distress caused by cold showers, cold food, unsanitary dishes, insect problems, inadequate clothing, and presence of a cesspool barred by PLRA); *Alexander v. Tippah County*, 351 F.3d 626 (5th Cir. 2003) (per curiam) (nausea from smell of sewage that did not warrant medical attention, was not alleged to be a symptom of a more serious malady, and had no lasting effects was *de minimis*).

[10] *Smith v. Leonard*, 244 F. App'x 583 (5th Cir. 2007) (Smith's alleged symptoms; headaches, sinus problems, trouble breathing, blurred vision, irritated eyes, and fatigue—caused by lead paint, mold, asbestos, and unsanitary food slots—may be sufficient to state a claim of physical injury under 42 U.S.C. § 1997e(e)).

[Jackson's] preexisting medical conditions were aggravated by being placed in the gym for approximately five days, with the conditions of having to get up and down from the floor[.]

. . .

[T]here is no evidence to substantiate Jackson's allegations of sustaining any injuries[.]

Dkt. No. 34 at 10.

Defendants rely on the absence of record entries to demonstrate that, regardless of the time Jackson was in the gym, there is no evidence his medical conditions were aggravated by sleeping on the floor. This is partially true, but there are some exceptions. Viewed in a light most favorable to Jackson, he appears to be claiming that he spent two stints on the gym floor, one of five days from September 26 to October 1 and a later one from November 11 until his December 7 transfer to the Lindsey Unit. Start with the first stint and the exam which precipitated his removal from the gym at that time.

On October 1, while assigned to the gym, Jackson presented to medical staff with "Nervous System Complaints" which manifested as "dizziness, weakness" and feeling faint. Dkt. No. 36 at 4. Jackson's history of having recently had a heart attack was noted under "Significant medical history." *Id*. at 4–5. His general appearance was noted as "Flushed" and his gait was described as "Unsteady – provider notified." *Id*. According to the nurse practitioner, Jackson was placed in a wheelchair for five days and then "placed in [RH] as the gym does not have any beds to accommodate offender healthcare disability." Dkt. No. 36 at 5, 41.

And on October 6, four days after Jackson was reassigned out of the gym to RH, he

submitted a sick-call request stating:

> I been having a numbing pain the past few days from my prostate. I found what looks like blood possibly in my underwear. I just noticed after I took a shower. I just want to let you know I been feeling this pain for about 2-3 days.

*Id*. at 35. On this day, Jackson arrived at the medical unit in his wheelchair, was examined, and provided Tylenol for the pain caused by an unspecified urinary tract problem. *Id*. at 36. He also, evidently, stated that his pain level was a 2 out of 10. *Id*. ("Pain (description): 2-10"). Although Jackson noted a swollen prostate during intake, and complained of this prostate pain starting at the end of his first stint, a "numbing pain" rated at 2 out of 10 for a few days is *de minimis*. *Id*. at 36, 63.

Further, Jackson failed to persuasively allege a causal link between getting up and down off a floor and a bleeding prostate. Dkt. No. 11 at 7 (for the question of how the gym conditions caused medical damages, Jackson stated "getting up and down off the floor . . . caused my prostate to bleed slightly because medical detected blood in my urine.") (cleaned up). The causal link becomes even more unclear when the blood found in Jackson's urine was tied to an unspecified urinary tract problem. Dkt. No. 36 at 36. Therefore, Jackson's allegations related to his floor placement causing an aggravation of his pre-existing prostate issues is unconvincing, or *de minimis* at best.

The other medical visits reflected in the summary judgment evidence which occurred between Jackson's first removal from the gym and his transfer to the Lindsay Unit are:

| | |
|---|---|
| October 3: | Lower gastro-intestinal symptoms. Dkt. No. 36 at 38. |
| October 11: | Mental health evaluation. *Id*. at 78–81. |
| October 14: | Initial psychiatric evaluation. *Id*. at 73–76. |

26

| | |
|---|---|
| October 24: | Chart review. *Id*. at 22. |
| October 27: | Blood and pain with urination; urine urgency. *Id*. at 20. |
| November 10: | Chart review (reflects "single cell housing due to issue with mobility" but questions need for wheelchair). *Id*. at 17. |
| November 11: | RH referral for reassessment of wheelchair need (hips x-rayed and within normal limits; wheelchair replaced with walker with instructions "may be sent back to GP"). *Id*. at 15. |
| November 15: | Chest pain/shortness of breath (rested in medical with instructions to afterward "send back to house" and "return to housing." *Id*. at 34. |
| Nov. 16–Dec. 7: | No medical records in evidence. |

A reasonable jury could find that the symptoms Jackson presented with on October 1 were related to his getting up and down from the floor. But Jackson was removed from the gym shortly thereafter and transient dizziness and weakness are insufficient to constitute a non-*de-minimis* injury.

Otherwise, the records before the Court do not reflect that Jackson suffered any aggravation or distress from sleeping on the floor, even assuming he was later returned to the gym as he claims. Jackson's verified allegations—strain, stinging in chest, less sleep, and slight prostate bleeding—by themselves are insufficient to create a fact issue regarding a non-*de-minimis* injury. If, however, as Jackson claims, he was returned to the gym floor for several weeks immediately before being transferred to the Lindsey Unit, then his intake exam at Lindsey Unit would be the best record of whether he was suffering from aggravated pre-existing conditions.

On December 7, 2022, the Lindsey Unit staff performed an "ICN Newly Assigned Chart Review" upon Jackson's intake. That chart review reveals nothing that could reasonably be related to Jackson sleeping on the gym floor. Dkt. No. 36 at 30–32. Nor did

the Lindsey Unit's intake assessment of Jackson reveal any potentially floor-related issues. *See* Dkt. No. 36 at 52–54. Jackson appeared at the time to be essentially in the same condition as when his Middleton Unit intake evaluation was performed. *Compare id.* at 52–54, 70–71 *with id.* at 57–62. Moreover, Jackson alleged he "slept[] less due to pain." Dkt. No. 11 at 7. But on October 11, 2022, October 14, 2022, and December 16, 2022, Jackson reported he was sleeping "good," "adequately," "within his normal range", or "no difficulty sleeping." Dkt. No. 36 at 10, 74, 78. The record is absent of any reports showing his sleep was affected by his floor placement.

In short, the records before the Court do not reflect Jackson being seen by medical for aggravation of pre-existing conditions between the time he was first removed from the gym in early October and the time he arrived at the Lindsey Unit. Nor do they reflect his experiencing any conditions that could reasonably be related to sleeping on the gym floor, except as noted above. Thus, the only evidence Jackson suffered harm by sleeping on the floor is his verified allegations of strain, stinging in chest, loss of sleep, and slight prostate bleeding. These allegations, even verified, are insufficient to create a genuine factual dispute for a jury on whether Jackson suffered a compensable injury.

### 2.  The Second Prong: Clearly Established

Because Jackson cannot show he suffered a compensable injury, the Court need not address the "clearly established" prong of the qualified immunity analysis. But if the Court disagrees, the undersigned turns now to whether his right to be free from those conditions was clearly established. This second prong involves "two separate inquiries: whether the allegedly violated constitutional rights were clearly established at the time of the incident;

28

and, if so, whether the conduct of the defendants was objectively unreasonable in the light of that then clearly established law." *Hare v. City of Corinth*, 135 F.3d 320, 326 (5th Cir. 1998).

Defendants urge that "even assuming arguendo that the Court finds sufficient evidence of a constitutional violation, Warden Akwitti and Warden McCain would still be entitled to qualified immunity because their actions were objectively reasonable in light of clearly established law." Dkt. No. 34 at 13. They continue, "there is simply no precedent holding that pests and leaking toilets being controlled and maintained for a period of five days amounts to a constitutional violation." *Id*.

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks and modifications omitted). Even if an official's conduct violated a clearly established constitutional right, the official is nonetheless entitled to qualified immunity if his conduct was objectively reasonable under the circumstances. *See Jones v. Collins*, 132 F.3d 1048, 1052 (5th Cir. 1998).

"There are two ways to demonstrate clearly established law." *Batyukova v. Doege*, 994 F.3d 717, 726 (5th Cir. 2021). First, the plaintiff may identify a case—usually, a body of relevant case law—in which an officer acting under similar circumstances . . . was held to have violated the [Constitution]. *Joseph v. Bartlett*, 981 F.3d 319, 330 (5th Cir. 2020). (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63–64 (2018)) (internal quotation marks omitted). This first approach "do[es] not require a case directly on point[.]" *Batyukova*, 994 F.3d at 726. But the existence of the right must be "sufficiently clear" that

every reasonable officer would have understood the challenged conduct to have been unlawful. *Id.* (citing *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation marks omitted). In other words, "'[t]he central concept is that of "fair warning": The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warnings that the conduct at issue violated constitutional rights.'"" *Trammell v. Fruge*, 868 F.3d 332, 339 (5th Cir. 2017) (quoting *Ramirez v. Martinez*, 716 F.3d 369, 379 (5th Cir. 2013) (quoting, in turn, *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (en banc))).

> As the Fifth Circuit has explained:
>
> Rights are "clearly established" when "existing precedent 'squarely governs' the specific facts at issue," *Kisela v. Hughes*, 584 U.S.100, 104–05, 138 S. Ct. 1148, 1153, 200 L.Ed.2d 449 (2018) (per curiam) (quoting *Mullenix v. Luna*, 577 U.S. 7, 15, 136 S. Ct. 305, 193 L.E.2d 255 (2015) (per curiam)), *not* when a rule is merely "suggested by then-existing precedent," *City of Tahlequah v. Bond*, 595 U.S.9, 12, 142 S. Ct. 9, 11, 211 L.Ed.2d 170 (2021) (per curiam). The Supreme Court recently . . . reminded lower courts "not to define clearly established law at too high a level of generality." *Id.* Rather, courts must determine that existing precedent has rendered the right "beyond debate." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5, 142 S. Ct. 4, 8, 211 L.Ed.2d 164 (2021) (per curiam) (quoting *White v. Pauly*, 580 U.S. 73, 137 S. Ct. 548, 551, 196 L.Ed.2d 463 (2017) (per curiam)).

*Henderson v. Harris Cty.*, 51 F.4th 125, 132–33 (5th Cir. 2022).

The second way a plaintiff may demonstrate that a law is clearly established is with "the 'rare' possibility that, in an 'obvious case,' analogous case law 'is not needed' because 'the unlawfulness of the [challenged] conduct is sufficiently clear even though existing precedent does not address similar circumstances.'" *Joseph*, 981 F.3d at 330 (quoting *Wesby*, 138 S. Ct. at 590). "[I]n an obvious case, general standards can [therefore] 'clearly

establish' the answer, even without a body of relevant case law." *Roque v. Harvel*, 993 F.3d 325, 335 (5th Cir. 2021). But "[t]he standard for obviousness is sky high[.]" *Joseph*, 981 F.3d at 337.

Whether a right is clearly established is typically a question of law, but there may be factual disputes which are relevant to the determination. *Cruz v. Cervantez*, 96 F.4th 806, 813 (5th Cir. 2024). But ultimately, to defeat an assertion of qualified immunity, the plaintiff "has the burden to point out clearly established law [and] rais[e] a fact issue as to its violation." *Tucker v. City of Shreveport*, 998 F.3d 165, 173 (5th Cir. 2021). Again, Jackson has not filed a response to the Motion.

    a.  <u>A case or body of caselaw</u>

Pertaining to the "case or body of caselaw" path of demonstrating clearly established rights, the Court's "fair warning" inquiry should consider only published opinions issued before Jackson's assignment to the gym floor on September 26, 2022. *Tolan*, 572 U.S. 650, 656 (2014) (the second prong of the qualified-immunity analysis asks whether the right in question was "clearly established" at the time of the violation); *Marks v. Hudson*, 933 F.3d 481, 486 (5th Cir. 2019) (because unpublished opinions are not precedential, they "do not establish any binding law for the circuit" and thus "cannot be the source of clearly established law for qualified immunity analysis").

To find that Jackson raised a fact issue on whether his constitutional rights were violated required the undersigned to string together a varied combination of lesser-included fact issues about the individual conditions themselves, the length of time Jackson was exposed to those conditions, and Jackson's medical condition before and after the exposure

to the conditions. But it is the same complexity of how all these variables interact that preclude a finding that they violated clearly established law.

True, Jackson is not required to marshal a case on point. And there are some cases which cite to the holding in *Burleson v. Texas Dept. of Criminal Justice* that "Burleson alleged a violation of a clearly established constitutional right: the Eighth Amendment right to be free from conditions of confinement which pose an unreasonable risk of damage to a prisoner's health." 277 F.3d 1374, *2 (2001). But the undersigned does not read *Burleson*, an unpublished decision, as establishing such a broad, general "clearly established right." Other conditions-of-confinement cases that might apply here similarly define that right at too high a level of generality to conclude that those cases "squarely govern" this case. *Cope v. Cogdill*, 3 F.4th 198, 204–05 (5th Cir. 2021) (citing *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004) (per curiam); *Mullenix*, 577 U.S. at 12 (emphasizing that "[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established" (internal quotation marks and citation omitted))).

The authority that does exist is not sufficiently specific to put all reasonable officials on notice that Defendants' conduct was definitively unlawful. *Buehler v. Dear*, 27 F.4th 969, 981 (5th Cir. 2022). Nor has Jackson pointed to a body of law that would put the unconstitutionality of these combined conditions "beyond debate." *Ashcroft*, 563 U.S. at 741. Reasonable minds could make arguments either way. Therefore, even though the undersigned finds that Jackson has created factual disputes regarding whether Defendants violated his right to safe and sanitary living conditions, there was no clearly established body of law at the time that would have put every reasonable officer on notice that this

32

complex set of circumstances definitively violated that right.

      b. <u>Obvious exception</u>

The facts here also do not meet the "obvious" exception. *Taylor* and *Pelzer* involved circumstances so egregious that any reasonable officer would have known they violated the Constitution. In *Taylor*, prison officials confined an inmate for six full days in two "shockingly unsanitary cells"—one covered nearly floor to ceiling in massive amounts of feces, and the other frigidly cold with urine on the floor where the inmate was required to sleep naked. 592 U.S. at 7–8. In *Pelzer*, an inmate was restrained to a hitching post for seven hours without bathroom breaks as punishment, forced to remove his shirt so the sun would burn his skin, and taunted with water given first to the dogs and then spilled on the ground. 536 U.S. at 734–35.

Jackson may have been forced to endure the conditions here for a significantly longer period of time. And it has been suggested that the need for granularity with the "clearly established" prong may be more leniently applied where "the correctional officers had plenty of time to assess their horrific conduct and recognize that it obviously violated the law." *Villarreal*, 134 F.4th at 282 (Oldham, J., concurring). Judge Oldham explained that with the egregious facts of *Taylor*, "it was of no moment that precedent had only clearly established a general prohibition on 'inhumane' conditions of confinement", especially in light of no "exigency". *Id.* (citing *Farmer*, 511 U.S. 832). That said, Judge Oldham observed at the same time, "the Court had apparently 'never—until Taylor—actually used' the obviousness standard 'to decide a case.'" *Id.* fn 6 (citing Comment, *Taylor v. Riojas*, 135 HARV. L. REV. 421, 429 (2021)).

The standard for holding Defendants liable based on "obviousness," rather than clearly established law, is exceptionally high. *Joseph*, 981 F.3d at 337. Although the conditions here were deplorable, they do not rise to the level of deplorability in *Taylor* or *Pelzer*.

## V.  CONCLUSION

The facts, when viewed in the light most favorable to Jackson, would permit a reasonable jury to find that Jackson was objectively exposed to a substantial risk of serious harm and that the Defendants were subjectively indifferent to that risk. But a reasonable jury could not find that Jackson suffered a compensable injury, nor could it find that Jackson's right to be free from the objectively serious conditions was clearly established. Accordingly, the undersigned RECOMMENDS that the Court GRANT Defendant Akwitti and McCain's Motion for Summary Judgment on Qualified Immunity.

The undersigned further recommends that Jackson's motion be DENIED.

## VI.  RIGHT TO OBJECT

A copy of these Findings, Conclusions, and Recommendations shall be served on all parties in the manner provided by law. Any party who objects to any part of these Findings, Conclusions, and Recommendations must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding or recommendation to which the objection is made, state the basis for the objection, and specify the place in the magistrate judge's Findings, Conclusions, and Recommendations where the disputed determination is found. An objection that merely incorporates by reference or refers to the

briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

## VII. CASE TRANSFER

Having completed the preliminary screening of Jackson's claims, the undersigned ORDERS that this case be TRANSFERRED back to the docket of the United States District Judge and designated as Civil Action Number No. 1:23-CV-00093-H.

ORDERED this 24th day of November 2025.

_____
JOHN R. PARKER
UNITED STATES MAGISTRATE JUDGE